

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-11-2005

# In Re Cendant Corp

Precedential or Non-Precedential: Precedential

Docket No. 03-3603

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"In Re Cendant Corp " (2005). *2005 Decisions.* Paper 1284.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/1284

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

Nos. 03-3603, 03-3604, 03-3648

———

IN RE: CENDANT CORPORATION
SECURITIES LITIGATION


DEBORAH LEWIS, JEFF MATHIS and WOLF
HALDENSTEIN
ADLER FREEMAN AND HERZ LLP,

*Appellants in No. 03-3603*

ALAN CASNOFF;
MILLER FAUCHER AND CAFFERTY LLP,

*Appellants in No. 03-3604*

ALFRED WISE;
FINKELSTEIN, THOMPSON & LOUGHRAN,

*Appellants in No. 03-3648*

———

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 98-cv-01664)
District Judge: Honorable William H. Walls

———

Argued: December 14, 2004
Before: NYGAARD, ROSENN, and BECKER, *Circuit Judges*.

(Filed April 11, 2005)

DANIEL W. KRASNER (ARGUED)
Wolf, Haldenstein, Adler, Freeman & Herz
270 Madison Avenue
New York, NY 10016
*Attorney for Appellants Lewis et al.*

ELLEN MERIWETHER (ARGUED)
Miller, Faucher and Cafferty
18th & Cherry Streets
One Logan Square, 17th Floor
Philadelphia, PA 19103
*Attorney for Appellants Casnoff et al.*

BURTON H. FINKELSTEIN (ARGUED)
Finkelstein, Thompson & Loughran
1050 30th Street, N.W.
Washington, DC 20007
*Attorney for Appellants Wise et al.*

MAX W. BERGER
DANIEL L. BERGER
JEFFREY N. LEIBELL
Bernstein Litowitz Berger & Grossmann LLP
1285 Avenue of the Americas
New York, NY 10019
LEONARD BARRACK

GERALD J. RODOS
JEFFREY W. GOLAN (ARGUED)
Barrack, Rodos & Bacine
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
*Attorneys for Appellees*

_____

OPINION OF THE COURT

_____

BECKER, *Circuit Judge*.

2

**I. Introduction and Overview** . . . . . . . . . . . . . . . . . . . . . . . . . 4

**II. Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *A. The Suit, Settlement, and Initial Fee Award* . . . . . . . . 8
    *B. The Excluded Firms* . . . . . . . . . . . . . . . . . . . . . . . . . 9
    *C. The Post-April 15 Purchasers* . . . . . . . . . . . . . . . . . 10
    *D. The Plan of Allocation* . . . . . . . . . . . . . . . . . . . . . . . 12

**III. Jurisdiction and Standard of Review** . . . . . . . . . . . . . 13

**IV. Legal Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    *A. The Common Fund Doctrine* . . . . . . . . . . . . . . . . . . . 15
        1. The Role of the Courts in Common Fund Cases 15
        2. Awarding Fees Under the Common Fund
           Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . 19
    *B. The PSLRA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
        1. The PSLRA Lead Plaintiff . . . . . . . . . . . . . . 22
        2. The Choice of Lead Counsel . . . . . . . . . . . . . 23

**V. The Common Fund Doctrine After the PSLRA**
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    *A. Before Appointment of Lead Plaintiff* . . . . . . . . . . . 25
        1. Pre-Appointment Work Generally . . . . . . . . . 27
        2. Compensation for Filing Complaints
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    *B. After Appointment of Lead Plaintiff* . . . . . . . . . . . . 32
        1. In General . . . . . . . . . . . . . . . . . . . . . . . . . 32
        2. Representation of Individual Class Members 38
        3. Representation of Uncertified Subclasses
           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

**VI. The Finkelstein, Thompson & Loughran Appeal**
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**VII. The Miller Faucher and Wolf Haldenstein Appeals** . . 43
    *A. Filing Stub-Period Complaints* . . . . . . . . . . . . . . . . 43
    *B. Improving the Pleading of Stub-Period Allegations*
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
        1. Wolf Haldenstein . . . . . . . . . . . . . . . . . . . . 47

     2. Miller Faucher . . . . . . . . . . . . . . . . . . . . . . . . 48
  *C. Monitoring the Settlement Allocation* . . . . . . . . . . . 50
     1. The Uncertified Subclass . . . . . . . . . . . . . . . . 51
     2. Was Wolf Haldenstein's Work Gratuitous? . 52
     3. Did Wolf Haldenstein's Actions Increase the
         Recovery? . . . . . . . . . . . . . . . . . . . . . . . . 54

**VIII. Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

## I. Introduction and Overview

This is another set of appeals arising out of the $3.2 billion settlement of the shareholders' securities class action brought against the Cendant Corporation. This litigation has previously provided us with the opportunity to examine the effect of the Private Securities Litigation Reform Act of 1995 (PSLRA) on the selection and compensation of class counsel. *See In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) (*Cendant I*).[1] The present appeals require us to examine the effect of the PSLRA on non-class counsel.

Appellants are three law firms who represented members of the victorious class of Cendant plaintiffs. These firms were not selected by the District Court to serve as lead counsel for the class and were not compensated out of the $55 million in fees ultimately awarded to the appointed lead counsel. However, they claim that the work that they performed during the litigation and negotiation of this suit benefited the plaintiff class, and that they are therefore entitled to compensation from the class's recovery. The firms' alleged right to fees stems from a longstanding equitable doctrine that allows parties or attorneys who create or maintain a common fund for the benefit of others to claim compensation from that fund.

As we explained in *Cendant I*, however, the PSLRA has

---

[1]While this was not the first appeal taken in this lengthy litigation, *see, e.g.*, *Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000); *In re Cendant Corp.*, 260 F.3d 183 (3d Cir. 2001), it was the first to address counsel fees, and will therefore be denominated *Cendant I* for convenience.

significantly altered the landscape of attorneys' fee awards in securities class actions. The historic common fund doctrine, which has traditionally governed the compensation of lead counsel in all class actions, has yielded, in PSLRA cases, to a paradigm in which the plaintiff with the largest stake in the case, usually a large and sophisticated institution, is accorded the status of lead plaintiff and assigned the right to appoint and duty to monitor lead counsel for the class. In *Cendant I*, we recognized that this paradigm necessarily entails deferring to the lead plaintiff in decisions about lead counsel's compensation. Accordingly, we rejected the District Court's use of an auction mechanism to select and compensate lead counsel, and remanded for a determination of attorneys' fees in accordance with the agreement between lead plaintiffs and their chosen lead counsel.

In the instant appeal we extend the analysis of *Cendant I* to the fee applications of firms that were *not* designated as lead counsel. The Cendant lead plaintiffs, and their lead counsel, act as appellees here. They argue that, just as PSLRA lead plaintiffs are entitled to significant discretion in selecting and compensating lead counsel, so too are they entitled to similar discretion in determining whether other firms have benefited the class, and whether and to what extent to compensate such firms.

We find the lead plaintiffs' arguments convincing. A careful reading of the PSLRA, and of *Cendant I*, reveals that the new paradigm of securities litigation significantly restricts the ability of plaintiffs' attorneys to interpose themselves as representatives of a class and expect compensation for their work on behalf of that class. The PSLRA lead plaintiff is now the driving force behind the class's counsel decisions, and the lead plaintiff's refusal to compensate non-lead counsel will generally be entitled to a presumption of correctness.

Of course, much work will be done before the lead plaintiff is appointed, when no single class member controls the litigation. Thus the court will retain the primary responsibility for compensating counsel who do work on behalf of the class prior to appointment of the lead plaintiff, though courts may take into account the views of the lead plaintiff in awarding such compensation. The traditional common fund doctrine will remain the touchstone of this analysis, and non-lead counsel will have to demonstrate that their work actually benefited the class. In

particular, the filing of multiple complaints each alleging the same facts and legal theories will not result in fee awards for each firm that files a complaint: such copycat complaints do not benefit the class, and are merely entrepreneurial efforts taken by firms attempting to secure lead counsel status. This conclusion disposes of the appeal of Finkelstein, Thompson & Loughran, one of the appellant firms, which did nothing more than file a complaint that was substantially identical to dozens of other complaints filed in this litigation.

After the lead plaintiff is appointed, however, the PSLRA grants that lead plaintiff primary responsibility for selecting and supervising the attorneys who work on behalf of the class. We conclude that this mandate should be put into effect by granting a presumption of correctness to the lead plaintiff's decision not to compensate non-lead counsel for work done after the appointment of the lead plaintiff. Non-lead counsel may refute the presumption of correctness only by showing that lead plaintiff violated its fiduciary duties by refusing compensation, or by clearly demonstrating that counsel reasonably performed work that independently increased the recovery of the class.

After setting out the general standards, we turn to several specific issues that arise in this case. First of all, we conclude that representation of individual class members—and, in particular, monitoring of the progress of the litigation on behalf of those members—is not compensable out of the class's common recovery. All of the appellant firms here claim that they monitored the class action, but none can show that this monitoring independently increased the recovery of the class.

Next, we examine a broader issue. Two of the appellant firms, Miller, Faucher and Cafferty and Wolf, Haldenstein, Adler, Freeman & Herz, claim that they represented what was in effect an uncertified subclass of Cendant plaintiffs, which we will refer to as the "stub plaintiffs." These firms asked the District Court to clarify the class definition so as to create a subclass consisting of claimants who purchased shares after a misleading partial disclosure of the fraud at Cendant, but the District Court refused, finding that the lead counsel in this case could adequately represent the interests of these claimants as part of the certified class.

Our review of the purposes of subclass certification convinces us that lawyers who claim to represent an uncertified

6

putative subclass generally have no more right to a fee awarded out of the common recovery—whether that recovery is defined as the subclass's recovery or the recovery of the class as a whole—than do any other non-lead counsel. Simply claiming to do work on behalf of a specific group, which the court has declined to certify as a subclass, does not refute the presumption of correctness that attaches to lead plaintiff's decision not to compensate a firm. Thus, the two appellant firms cannot claim fees for representing the stub plaintiffs in this litigation.

Finally, we turn to the more specific claims of the appellant firms. In particular, we examine claims made by Miller Faucher and Wolf Haldenstein that their work was conducted at the request of lead counsel, and that it benefited the class as a whole. If true, these claims would serve to refute the presumption of correctness, as they would demonstrate that the appellant firms did their work with an expectation of compensation and that it independently benefited the class. However, our review of the facts leads us to conclude that these appellant firms undertook their work without the approval of lead plaintiffs, and that their work did not measurably contribute to the class's recovery.

We therefore hold that the presumption of correctness that attaches to the lead plaintiff's decision has not been refuted in this case. We thus find that appellant firms are not entitled to any fees in this litigation, and will affirm the order of the District Court.

## II. Facts

On April 15, 1998, Cendant Corporation announced that it had discovered "accounting irregularities" in some of its business units, and that it expected to restate its 1997 financial statements. The next day, Cendant's stock fell by 47%. On July 14, 1998, Cendant announced that it would also restate its 1995 and 1996 financials; its stock fell by another 9%. And on August 28, 1998, the company disclosed the results of an internal investigation, revealing that it would restate its 1995-1997 financials by some $500 million. Cendant stock fell by another 11%. Overall, the stock fell from $35 5/8 per share on April 15 to $11 5/8 on August 31, a loss of over $20 billion in market capitalization, or some 67% of its initial value.

*A. The Suit, Settlement, and Initial Fee Award*

This drop in value, accompanied by clear evidence—and, indeed, admissions—of fraud, engendered numerous shareholder lawsuits. Between April and August 1998, at least sixty-four suits were filed under Exchange Act § 10(b) and Securities Act § 11, naming as defendants Cendant, various officers and directors, and Ernst & Young, the company's outside auditors. Pursuant to an order of the Judicial Panel on Multidistrict Litigation, these cases were consolidated in the District of New Jersey, before District Judge William H. Walls.

Pursuant to provisions of the PSLRA, *see* 15 U.S.C. § 78u-4(a)(3), the District Court appointed as Lead Plaintiffs a consortium of three large public pension funds (the California Public Employees' Retirement System (CalPERS), the New York City Pension Funds, and the New York State Common Retirement Fund).[2] This appointment came on September 4, 1998. The Lead Plaintiffs retained two law firms, Barrack, Rodos & Bacine and Bernstein Litowitz Berger & Grossman, to serve as Lead Counsel. The District Court ultimately approved the Lead Counsel after an open auction among law firms seeking to serve as class counsel, and appointed them as counsel for the putative class on October 9, 1998.

Lead Counsel then filed an Amended Complaint on behalf of the class, dated December 14, 1998, while also pursuing settlement talks. The District Court certified the class on January 27, 1999, and denied most of the defendants' motions to dismiss on July 27, 1999. *In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354 (D.N.J. 1999). However, it granted Ernst & Young's motion to dismiss with regard to charges that it violated the securities laws after April 15, 1998. *Id*. at 376. On December 17, 1999, the parties reached a proposed settlement involving a payout of approximately $3.2 billion of Cendant and Ernst & Young money; as part of the settlement, Cendant also agreed to make certain corporate governance changes. The District Court approved the settlement, and, pursuant to the terms of the winning auction bid, awarded

---

[2]Technically, the PSLRA provides for a single lead plaintiff, and the CalPERS consortium is considered a single plaintiff made up of three constituent funds. We find it easier, however, to refer to the three funds in the plural, as "Lead Plaintiffs."

$262 million in attorneys' fees to the Lead Counsel.

On appeal, this Court upheld the settlement, but reversed the award of attorneys' fees as unreasonable. *In re Cendant Corp. Litig.*, 264 F.3d 201 (3d Cir. 2001) (*Cendant I*). We found that the District Court had abused its discretion in holding an auction and remanded for a new fee determination pursuant to the Lead Plaintiffs' original retainer agreement with Lead Counsel. We also strongly suggested that fees in the $200 million range would likely be excessive, as the case was relatively simple and such fees would constitute an "extraordinarily high" lodestar multiplier of 25 to 45.[3] 264 F.3d at 285.

On remand, Lead Plaintiffs and Lead Counsel agreed to a $55 million fee award, which was approved as reasonable. *In re Cendant Corp. Litig.*, 243 F. Supp. 2d 166 (D.N.J. 2003). The District Court noted that this fee represented just 1.7% of the $3.2 billion settlement, and that Lead Counsel had spent some 35,000 hours prosecuting the case. *Id.* at 172-73.[4]

### B. The Excluded Firms

In preparing the fee application, Lead Counsel wrote to all the other firms involved in the Cendant case, asking them for their time and expenses incurred in the case. Ultimately, however, Lead Counsel shared the $55 million fee with just twelve other law firms. The Lead Plaintiff pension funds filed a declaration in connection with Lead Counsel's application for attorneys fees, in which they stated that they had authorized twelve firms to assist Lead Counsel, and that the work of those twelve firms had been considered in computing the fee application. Lead Plaintiffs noted that forty-five other law firms represented individual plaintiffs, but took the position that those firms had not conferred any benefit on the class, and had not been authorized by Lead Plaintiffs or Lead

---

[3]The "lodestar" is determined by multiplying the number of hours that counsel reasonably worked by the reasonable hourly rate for those services. *See* 264 F.3d at 255. The original $262 million fee in *Cendant I* would thus have represented a fee over 45 times as large as a reasonable hourly rate. *Id.* at 285.

[4]While the District Court did not perform a lodestar cross-check, this number would appear to lead to a multiplier in the mid-single digits.

Counsel to do any work on behalf of the class. Lead Plaintiffs therefore declined to include these firms in their fee request.

Of the forty-five excluded firms and attorneys, fourteen objected and requested attorneys' fees. The District Court held a hearing on the record regarding these fee applications on July 28, 2003, and rejected all the applications at the close of that hearing.

Three firms have appealed from the rejection of their petitions. One appellant firm, Finkelstein, Thompson & Loughran ("FTL"), represented Alfred Wise, who bought 500 shares of Cendant stock at about $37 on February 4, 1998, before any announcement of wrongdoing. FTL filed a complaint on Wise's behalf on July 6, 1998; this was the fifty-fifth such complaint filed against Cendant. FTL was not selected to serve as, or assist, Lead Counsel, and does not allege that it performed any work on behalf of the class after filing its complaint. Instead, it argues that its work in investigating the fraud at Cendant, and preparing and filing its complaint, should be compensated out of the class's recovery. FTL seeks fees of $44,252.50, which represent its lodestar, as well as expenses of $713.94.

### C. The Post-April 15 Purchasers

The other two appellant firms, Wolf Haldenstein Adler Freeman & Herz LLP ("Wolf Haldenstein") and Miller Faucher & Cafferty LLP ("Miller Faucher"), claimed to represent a subgroup of plaintiffs who purchased Cendant stock after the initial April 15, 1998, disclosure of wrongdoing, but before Cendant's July 14 announcement of further financial troubles. Wolf Haldenstein designates this group the "stub plaintiffs"; Miller Faucher calls them the "partial disclosure period purchasers." While the latter designation, unlike the former, has the advantage of clarity, we opt for brevity and refer to this group as the "stub plaintiffs" or "stub purchasers."

The first fifty-two complaints against Cendant were filed shortly after the April 1998 disclosures, and were consolidated into one action on June 1, 1998. These complaints alleged a class period that ended on April 15, 1998, the date of the first round of disclosures. On July 16, 1998, Wolf Haldenstein filed a class-action complaint on behalf of Dr. Deborah Lewis, who had purchased seventy-five Cendant shares on July 10, 1998 for $22 1/16 per share. This complaint alleged that the April 15 disclosure

was itself a false and misleading statement in violation of § 10(b), and sought to represent a stub class, separate from the main class, consisting of those who had purchased Cendant shares between the April 15 and July 14 disclosures. Wolf Haldenstein's complaint on behalf of Dr. Lewis was the first such stub-class complaint.[5] Four days later, on July 20, Miller Faucher filed its own complaint on behalf of putative stub-class representative Alan Casnoff, who had purchased 300 Cendant shares on April 20 at $23 9/16. The parties agree that these were the only stub-class complaints filed by any law firm.

Wolf Haldenstein and Miller Faucher then moved (on behalf of Lewis and Casnoff, respectively) to "clarify" the District Court's earlier order consolidating the class's claims into one action. In effect, the firms asked the court to designate a separate class for the stub-period claimants, with separate lead plaintiffs and lead counsel. In an order dated November 4, 1998, the District Court denied this motion and allowed the case to go forward as one unitary class.[6] *In re Cendant Corp. Litig.*, 182 F.R.D. 476 (D.N.J. 1998). The court acknowledged that the stub plaintiffs had alleged additional misstatements not raised in the earlier complaints, but determined that the already-designated Lead Plaintiffs could and would litigate the stub claims as part of a continuing pattern of wrongdoing at Cendant.

As noted above, Lead Counsel proceeded to file an Amended Complaint on December 14, 1998. The Amended Complaint asserted a class period running from May 31, 1995, through August 28, 1998, the date of Cendant's final curative disclosure. The class covered by the Amended Complaint thus

---

[5]Wolf Haldenstein later added Jeff Mathis, another stub-period purchaser, as a plaintiff.

[6]The District Court did create one separate class of plaintiffs, finding that the interests of holders of Cendant "Feline PRIDES" hybrid securities were distinct from those of the rest of the class, and certifying PRIDES holders as a separate class with separate lead counsel. The PRIDES class eventually agreed to a settlement with a stated value of some $340 million. *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 725 (3d Cir. 2001) (*Cendant PRIDES*). The firms involved in this appeal had no involvement in the PRIDES litigation.

included (a) the pre-April class covered by the initial fifty-two complaints, (b) the stub class covered by the Lewis and Casnoff complaints, and (c) a further class of plaintiffs who bought after the July 14 disclosure but before the final August 28 disclosure.

In early December, shortly before filing the Amended Complaint, Lead Counsel circulated a draft to counsel for all class members, asking them if their clients wished to be named in the consolidated complaint. On reviewing this draft complaint, Miller Faucher called Lead Counsel to suggest that the complaint should allege that the April 15 disclosure was materially false and misleading. Lead Counsel revised the Amended Complaint to make this allegation.

### D. The Plan of Allocation

The settlement reached between the class and Cendant involved payment to all three types of plaintiff—pre-April 15, post-April 15, and post-July 14—on identical terms, with one exception: under the settlement, plaintiffs who bought after April 15 were not entitled to share in any of the $335 million from Ernst & Young, because claims against the auditors arising after April 15 had been dismissed. On learning of the proposed settlement, in December 1999, Wolf Haldenstein communicated with Lead Counsel to advocate for the stub plaintiffs. In January 2000, Wolf Haldenstein suggested that the stub plaintiffs' claims were legally stronger than those of pre-April 15 purchasers, and that they should therefore receive at least 50% more on their claims than did other class members. And in March 2000, after reviewing the draft Plan of Allocation, Wolf Haldenstein wrote to Lead Counsel again to argue that the stub plaintiffs should share in the Ernst & Young money. In its review of the plan of allocation, Wolf Haldenstein retained John Hammerslough, a forensic damages expert. Lead Counsel rejected both of Wolf Haldenstein's suggested modifications to the settlement and ultimately convinced Wolf Haldenstein that the proposed settlement was fair to all class members.

Like FTL and the other non-authorized firms, Wolf Haldenstein and Miller Faucher were shut out of Lead Counsel's $55 million fee. Thus they petitioned the court for their own fees. Wolf Haldenstein requests $500,000 in fees and $30,859.27 in expenses; it claims 592.6 hours of work, for a lodestar of $242,893.50 and a multiplier of 2.06. Miller Faucher requests

$102,857.75 in fees and $4,113.08 in expenses. This is its lodestar.

### III. Jurisdiction and Standard of Review

The District Court had jurisdiction over this matter under Securities Act § 22(a), 15 U.S.C. § 77v(a); Exchange Act § 27, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331 & 1337. We have appellate jurisdiction under 28 U.S.C. § 1291, as the fee order was a final decision. We review the District Court's decision not to award attorney fees for abuse of discretion. *See In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 333 (3d Cir. 1998) (*Prudential*). An abuse of discretion "can occur 'if the judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous.'" *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 257 (3d Cir. 1995) (quoting *Electro-Wire Prods., Inc. v. Sirote & Permutt, P.C. (In re Prince)*, 40 F.3d 356, 359 (11th Cir. 1994)).

Some of the parties appear to be concerned that we might review the District Court's February 5, 2003, fee award to Lead Counsel. Such review would be clearly inappropriate; to appeal from that fee award, an objector would have had to file a Notice of Appeal within 30 days, or by March 2003. *See* Fed. R. App. P. 4(a)(1)(A). The appellant firms here never filed a Notice of Appeal from the February award to Lead Counsel; rather, they appeal only from the District Court's July 28, 2003, oral order denying *them* attorneys' fees.

The February 2003 fee award was based on the work that Lead Counsel and their designated assisting counsel performed. Their fee application included lodestar information for the work of the twelve authorized assisting firms, but disclaimed any work performed by the other forty-five firms. Thus it seems appropriate that, if we were to find that the appellant firms provided any benefit to the class, then their fees would be paid out of the class's $3.2 billion recovery, and not out of the $55 million fee already awarded to Lead Counsel. Lead Counsel argue for this result in their briefs, and at least one appellant firm, Miller Faucher, agreed to it at oral argument. There is thus no prospect of overturning the February 2003 fee award to Lead Counsel; the current appeal concerns additional fees, not a modification of the $55 million

already awarded.

## IV. Legal Background

As it did in *Cendant I*, our analysis begins with the traditional attorney-client relationship. At its core, this relationship involves an attorney with an ethical obligation to serve only the client's interests, and a client with the right and ability to select, monitor, and compensate his attorney:

> The power to select counsel lets clients choose lawyers with whom they are comfortable and in whose ability and integrity they have confidence. The power to negotiate the terms under which counsel is retained confers upon clients the ability to craft fee agreements that promise to hold down lawyers' fees and that work to align their lawyers' economic interests with their own. And the power to monitor lawyers' performance and to communicate concerns allows clients to police their lawyers' conduct and thus prevent shirking.

*Cendant I*, 264 F.3d at 254.

Attorneys who represent large classes of plaintiffs, rather than individual clients, have no less of an obligation to put their clients' interests ahead of their own. But members of such a class, unlike the active and involved individual clients of the traditional paradigm, frequently have little or no opportunity or incentive to monitor their attorneys' fidelity and zeal. Without such monitoring, class counsel may well give in to the temptation to shirk, to overcharge, or to prosecute or settle the case in a way that maximizes their own fees rather than the class's recovery. *See Cendant I*, 264 F.3d at 255; *see also* Alon Harel & Alex Stein, *Auctioning for Loyalty: Selection and Monitoring of Class Counsel*, 22 Yale L. & Pol'y Rev. 69, 71 (2004); Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053, 2064-66 (1995). The problem is particularly acute in securities class actions, in which thousands of small shareholders will have a modest financial interest in the

outcome of a suit which can involve damages in the billions. Such small shareholders are unable or unlikely to carefully monitor class counsel.

### A. The Common Fund Doctrine

Shareholders' class action cases present an additional problem, in that few or no individual shareholders will have much financial incentive to hire an attorney to prosecute their claims in the first place, but, in the aggregate, those claims are worth pursuing.

The "common fund doctrine" supplies one imperfect solution to this dilemma. The doctrine "provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820 n.39 (3d Cir. 1995) (*GMC*); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478-79 (1980). Such fees are generally set by the court, upon application by counsel.

Thus the common fund doctrine, in combination with the class-action mechanism, *see* Fed. R. Civ. P. 23, makes it economically feasible for securities plaintiffs to receive redress for corporate fraud. *See* Harel & Stein, *supra*, at 81. These mechanisms depend upon plaintiffs' attorneys to be the prime mover behind securities class actions: while individual plaintiffs generally have little reason to sue, their attorneys stand to earn huge fees if they succeed in winning a trial or settlement on behalf of the class. *See generally id.* at 81-82; Stephen A. Saltzburg et al., *Third Circuit Task Force Report on Selection of Class Counsel*, 74 Temp. L. Rev. 689, 690-92 (2001) (hereinafter "Task Force Report").

### 1. The Role of the Courts in Common Fund Cases

The common fund doctrine is essentially a matter of equity, *Boeing*, 444 U.S. at 478, and gives courts significant flexibility in setting attorneys' fees. For the doctrine to function, it is essential that the court supervise class counsel's performance and carefully scrutinize its fee applications. *See GMC*, 55 F.3d at 819. The court's scrutiny is, in essence, a substitute for active client

involvement, which is so often difficult to obtain in class actions. In traditional common fund cases, the court acts almost as a fiduciary for the class, performing some of the roles—i.e., monitoring and compensating class counsel—that clients in individual suits normally take on themselves. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 307-08 (3d Cir. 2005) (*Rite Aid*); *GMC*, 55 F.3d at 784 ("[T]he court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity, by approving appropriate representative plaintiffs and class counsel."); *In re Oracle Sec. Litig.*, 131 F.R.D. 688, 691 (N.D. Cal. 1990) (Walker, J.) (*Oracle*) ("[T]he court bears fiduciary responsibilities to the class.").

In *Cendant I*, we reviewed in some depth the two traditional methods for setting class-action attorneys' fees. *See* 264 F.3d at 255-257. In the lodestar method, the court multiplies the number of hours that lead counsel reasonably worked by the reasonable hourly rate for that work to determine the counsel's lodestar, which may be multiplied by a factor intended to compensate the attorneys for the risks they faced and any other special circumstances. *See* Task Force Report, *supra*, at 706-07. The second method, now dominant in common fund cases, is the percentage-of-recovery approach.[7] *See, e.g.*, *Prudential*, 148 F.3d at 333. Under this method, counsel are awarded a fee that is a percentage of the class's total recovery; the court determines the appropriate percentage based on a seven-factor test set out in *Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).[8] Our jurisprudence also urges a

---

[7]In particular, the PSLRA has made percentage-of-recovery the standard for determining whether attorneys' fees are reasonable. *See* 15 U.S.C. § 78u-4(a)(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."); *see also Rite Aid*, 396 F.3d at 300.

[8]The relevant factors are:

(1) the size of the fund created and the number of persons benefited; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity

"lodestar cross-check" to ensure that the percentage approach does not lead to a fee that represents an extraordinary lodestar multiple. *See Cendant PRIDES*, 243 F.3d at 742; *Gunter*, 223 F.3d at 195 n.1; *Rite Aid*, 396 F.3d at 305-07.

Both of these approaches have been subject to significant criticism. *See* Task Force Report, *supra*, at 706-07. Each leaves the court to make a fee determination with little concrete guidance. *See Oracle*, 131 F.R.D. at 696. Courts are dependent upon counsel for information about the quality and quantity of the attorneys' work, and must make their judgments of the appropriate lodestar multiple or percentage of recovery "after the fact and on the basis of imperfect information." Weiss & Beckerman, *supra*, at 2072 & n.95.

Several courts have therefore experimented with an auction approach to setting class counsel's fees in advance of litigation.[9]

---

and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter*, 223 F.3d at 195 n.1.

[9]This approach was pioneered by Judge Vaughn Walker of the Northern District of California in the Oracle securities litigation. *See Oracle*, *supra*, 131 F.R.D. 688; *see also In re Oracle Sec. Litig.*, 136 F.R.D. 639 (N.D. Cal. 1991); 132 F.R.D. 538 (N.D. Cal. 1990). Judge Walker asked each firm to submit an application detailing its qualifications and the percentage of any recovery that it would charge as its fee, 131 F.R.D. at 697, most firms proposed a fee schedule under which the percentage would decline as the recovery increased, *see* 132 F.R.D. at 543, and Judge Walker thereafter chose the firm whose bid "conform[ed] to the fee structure associated with a competitive market," *id.* at 547.

While the auction approach has been criticized from several corners, *see, e.g.*, *Cendant I*, 264 F.3d at 277-79; John C. Coffee, Jr., *The Unfaithful Champion: The Plaintiff as Monitor in Shareholder Litigation*, Law & Contemp. Probs., Summer 1985, at 5, 77; Harel & Stein, *supra*, at 94-95; Samuel Issacharoff, *Governance and Legitimacy in the Law of Class Actions*, 1999 Sup. Ct. Rev. 337, 375 n.134, it has also been widely followed. Numerous federal district courts have used some form of auction to appoint lead counsel in securities and other class actions. *See, e.g.*, *In re Bank One S'holders Class Actions*, 96 F. Supp.

Indeed, the District Court in this litigation initially used the auction approach. *See In re Cendant Corp. Litig.*, 182 F.R.D. 144 (D.N.J. 1998). In our review of that decision in *Cendant I*, we discussed the auction method at length, but ultimately held that the District Court had abused its discretion in auctioning off the right to represent the class. We found that the PSLRA creates an exclusive mechanism for appointing and compensating class counsel in securities class actions, and does not permit auctions in the ordinary case.[10] *See* 264 F.3d at 273-80. We return to the PSLRA in Part IV.B, *infra*; at

---

2d 780, 784 (N.D. Ill. 2001) (Shadur, J.) (*Bank One*); *In re Auction Houses Antitrust Litig.*, 197 F.R.D. 71 (S.D.N.Y. 2000) (Kaplan, J.); *In re Lucent Techs., Inc. Sec. Litig.*, 194 F.R.D. 137 (D.N.J. 2000) (Lechner, J.); *In re Quintus Sec. Litig.*, 201 F.R.D. 475 (N.D. Cal. 2001) (Walker, J.). Several courts, *e.g.*, *Auction Houses*, 197 F.R.D. at 82-85, and academic commentators, *e.g.*, Harel & Stein, *supra*, at 107-21, have proposed modifications to the original *Oracle* formula in order to more closely mirror market conditions or to better align the interests of lead counsel and the class.

Our Court has been wary of the auction approach. The Third Circuit Task Force on the Selection of Class Counsel concluded that "auctions generally fail in their basic stated purpose of replicating the private market for legal services." Task Force Report, *supra*, at 737. It therefore recommended that auctions be used only "in certain limited situations," *id*. at 741, and listed a number of factors for a court to consider in deciding whether or not to conduct an auction, *id*. at 742-45. In particular, the existence of a sophisticated lead plaintiff is a factor counting against the auction approach: "There is no need for a court to be heavily involved in creating a market through an artificial structure if an experienced plaintiff with substantial resources is capable and willing to enter into a competitive search for, and fee negotiation with, qualified counsel." *Id*. at 744.

[10]The auction employed by the District Court in this case gave Lead Plaintiffs' chosen law firms the right to match the lowest bid in the auction. The chosen firms exercised that right, and were named Lead Counsel. We therefore found the District Court's error in holding the auction harmless insofar as it affected counsel selection, because the counsel selected by auction were the same as those selected by the Lead Plaintiffs. *Cendant I*, 264 F.3d at 280. We reversed, however, for a redetermination of counsel fees in accordance with the original retainer agreement, rather than the auction fee schedule. *See id*. at 285.

this juncture, it will be useful to review the recent common fund jurisprudence to see how courts conduct the inquiry into whether and how counsel benefited the common fund.

### 2. Awarding Fees Under the Common Fund Doctrine

The lodestar and percentage-of-recovery methods both address the problem of determining how large a fee to award to successful lead counsel. But the instant appeal raises a different problem. Here, the first question is not how large a fee to award, but *who* has properly earned a fee for representing the class. Lead Counsel argue that only they and their designated assisting firms did work that led to the favorable settlement, while appellant firms claim that their work also conferred benefits on the class and should be compensated.

Arguably the most closely analogous precedent is *Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994), a pre-PSLRA case with facts similar to those here. After MiniScribe Corporation collapsed, a number of shareholders brought securities actions; these were all consolidated into one class action, and not all of the plaintiffs' attorneys were designated as class counsel. After the class action settled, all of the attorneys requested fees, and a special master was appointed. He found that the work of the many attorneys who filed their own suits was duplicative, but

> nonetheless recommended an award of ten percent of the total fee to Non-Designated Counsel [i.e., attorneys who were not chosen as class counsel], on the ground that the duplication of work was largely "unavoidable," permitting Non-Designated Counsel to recover some of their fees encourages enforcement of the securities laws, and the multiplicity of law suits initially filed enhances the possibility that at least one named plaintiff will be an appropriate class representative.

*Id.* at 484.

The district court disagreed, and reversed the award of fees to non-designated counsel. On appeal, the Tenth Circuit again reversed, and reinstated the special master's fee award. The court found that "numerous actions were initially filed, and counsel

vigorously pursued those cases for sixteen months before class counsel was designated." *Id.* at 488. The district court had encouraged nondesignated counsel to coordinate their efforts, and the Tenth Circuit found that those attorneys had vigorously prosecuted their cases. *Id.* at 489. In fact, lead counsel recognized nondesignated counsel's efforts, and requested submission of any work product that might be useful to the class, upon its appointment as class counsel. *Id.*

The court continued:

> Moreover, it seems implausible that all of sixteen months of work, pursued on multiple fronts by multiple counsel, suddenly becomes worthless upon the selection of a few counsel to serve as class counsel. . . . And while there obviously was some duplication in the work of all counsel simultaneously pursuing many actions, we fail to see why the work of counsel later designated as class counsel should be fully compensated, while the work of counsel who were not later designated class counsel, but on whose shoulders class counsel admittedly stood, should be wholly uncompensated.

*Id.* The Tenth Circuit also dismissed the district court's conclusion that "entrepreneurial" plaintiffs' firms necessarily take the risk that they will not be selected as class counsel:

> The motivations of the lawyers filing such actions are irrelevant to the value, if any, of their services. Whether motivated by altruism, greed, or entrepreneurial zeal, the quality of the attorneys' legal services should be objectively ascertainable. If they have indeed conferred a benefit on the class, as here, they should receive some compensation.

*Id.*

*Gottlieb* thus stands for a quite permissive interpretation of the common fund doctrine, compensating "copycat" plaintiffs' firms for their investigation and prosecution of the claims largely on the basis of the quality of their work. Nonetheless, even under

this permissive standard, mere diligent and competent work is not sufficient to earn compensation: the work must actually benefit the class in order to be rewarded out of the common fund.

While *Gottlieb* represents one plausible view, we note that our Court has taken a more stringent view of the common fund doctrine. For example, in rejecting a fee award to class counsel in a case in which state government lawyers also performed much of the investigation and negotiation, we criticized the district court for "not attempt[ing] to distinguish between those benefits created by the [state attorneys] and those created by class counsel." *Prudential*, *supra*, 148 F.3d at 338. While the *Prudential* panel did not specifically address the issue of duplicative work, it did focus on the independent creation of benefits, not merely on compensating attorneys for work on behalf of the class (whether or not that work resulted in benefits).

Judge Lewis Kaplan of the United States District Court for the Southern District of New York, another important innovator in the auction mechanism for choosing class counsel, *see* note 9, *supra*, has also adopted an approach that is less generous to common fund claimants than is the approach of *Gottlieb*. *See In re Auction Houses Antitrust Litig.*, No. 00 Civ. 0648, 2001 WL 210697 (S.D.N.Y. Feb. 26, 2001) (Kaplan, J.) (*Auction Houses*). *Auction Houses* was a common fund case in which Judge Kaplan denied legal fees to most firms who were not appointed lead counsel (or interim lead counsel) by the court. In particular, he refused to reward work done by non-lead counsel that was duplicative of the efforts of lead counsel, holding that most of such counsel's "entrepreneurial" work should not be compensated out of the class's recovery, and that counsel's "monitoring" of the action on behalf of their individual class-member clients was similarly not compensable. 2001 WL 210697, at *4.

In Part V, *infra*, we will discuss the effect of the PSLRA on a court's decision to compensate counsel. For now, we simply note that the common fund doctrine itself imposes boundaries on that decision independent of the PSLRA. The cases are unanimous that simply *doing* work on behalf of the class does not create a right to compensation; the focus is on whether that work provided a benefit to the class. In the ordinary case, most work that lead counsel does will typically advance the class's interests, but the inquiry into non-lead counsel's work must be more detailed. Non-lead counsel will

have to demonstrate that their work conferred a benefit on the class *beyond* that conferred by lead counsel. Work that is duplicative of the efforts of lead counsel—e.g., where non-lead counsel is merely monitoring appointed lead counsel's representation of the class, or where multiple firms, in their efforts to become lead counsel, filed complaints and otherwise prosecuted the early stages of litigation—will not normally be compensated.

## *B. The PSLRA*

To respond to the difficulties that securities plaintiffs face in monitoring class counsel, as well as to reduce the frequency of meritless securities-fraud lawsuits, Congress enacted the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended at 15 U.S.C. § 74u-4) (PSLRA). Two aspects of the PSLRA are relevant to our discussion here: its deference to the court-appointed lead plaintiff, and its mechanism for selecting class counsel.

## 1. The PSLRA Lead Plaintiff

In *Cendant I*, we explained that the PSLRA's attorney-selection provisions had their genesis in Elliot J. Weiss and John S. Beckerman's article, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions*, 104 Yale L.J. 2053 (1995). *See* 264 F.3d at 261-62. Weiss and Beckerman began from the premise that "attorneys operating on a contingent fee basis initiate most [securities] suits in the names of 'figurehead' plaintiffs with little at stake." Weiss & Beckerman, *supra*, at 2054. Such figurehead plaintiffs are unlikely to monitor attorneys to ensure faithful service to the class. *See id.* at 2088; *see also Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1309 n.9 (3d Cir. 1993) ("Generally, the costs of monitoring will exceed the pro rata benefit to any single shareholder even though they may be lower than the benefits to all.").

But Weiss and Beckerman pointed out a possible solution: appoint institutional investors, who own a majority of the stock of public corporations and typically account for a majority of the dollar value of claims in securities class actions, as lead plaintiffs. Weiss & Beckerman, *supra*, at 2056. Such investors might have multimillion-dollar interests in securities class actions, and so would have every incentive to make sure that class counsel are

22

doing a good job prosecuting their claims. This insight formed the basis of the PSLRA's provisions requiring courts to appoint as lead plaintiff the "member or members of the purported class that the court determines to be most capable of adequately representing the interests of class members," 15 U.S.C. § 78u-4(a)(3)(B)(i), and creating a rebuttable presumption that this "most adequate plaintiff" is the plaintiff who otherwise satisfies the requirements of Rule 23 and has the "largest financial interest in the relief sought by the class," 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).

While the PSLRA focuses on plaintiffs' financial stake in the suit, Weiss and Beckerman point out that large claimants are typically institutional investors, Weiss & Beckerman, *supra*, at 2088-93, and that such institutions, as sophisticated businesses and repeat players in the class-action business, "have or readily could develop the expertise necessary" to monitor shareholder suits, *id*. at 2095; *see also id.* at 2106. As we noted in *Cendant I*, "the goal of the Reform Act's lead plaintiff provision is to locate a person or entity whose sophistication and interest in the litigation are sufficient to permit that person or entity to function as an active agent for the class." 264 F.3d at 266.

Thus the PSLRA strives to ensure that the lead plaintiff will have both the incentive and the capability to supervise its counsel in the best interests of the class. We noted in *Cendant I* that the PSLRA's "detailed procedures for choosing the lead plaintiff . . . indicat[e] that Congress attached great importance to ensuring that the right person or group is selected." 264 F.3d at 273. From this fact, we inferred that Congress meant to give the lead plaintiff significant responsibility in controlling the litigation. But, as we noted, this responsibility was formally manifested in only one area: "The only powers expressly given to the lead plaintiff . . . are to 'select and retain' counsel." *Id*.

2. The Choice of Lead Counsel

The PSLRA is explicit that the power to select counsel resides in the lead plaintiff: that plaintiff "shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). This is a sea change from the prior race-to-the-courthouse system, where "lead counsel have historically chosen the lead plaintiff rather than vice versa." *Cendant I*, 264 F.3d at 274. It is also at odds with the auction

approach favored by many courts in non-PSLRA class actions. Auctioning the lead counsel position leaves the selection and monitoring of counsel firmly in the hands of the court, rather than the lead plaintiff. In *Cendant I* we determined that this is generally incompatible with the purposes of the PSLRA and its "underlying assumption that, at least in the typical case, a properly-selected lead plaintiff is likely to do as good or better [a] job than the court at these tasks." 264 F.3d at 276. We thus reversed the District Court's use of an auction in this case, and concluded that the Lead Plaintiffs' original choice of Lead Counsel should have been confirmed.

The court may appoint lead counsel in PSLRA cases, by auction or otherwise, only in the unusual situation in which no sophisticated lead plaintiff can be trusted to fulfill its duties to the class under the PSLRA. *Id.* at 277; *see also In re Quintus Sec. Litig.*, 201 F.R.D. 475, 486 (N.D. Cal. 2001) (employing an auction, but noting that "the court would be hesitant to employ competitive bidding if an institutional investor had come forward and negotiated a fee arrangement that appeared reasonable"); *cf. In re Cavanaugh*, 306 F.3d 726, 732-33 (9th Cir. 2002) (following *Cendant I* and reversing a district court's choice of a lead plaintiff who was not the PSLRA "most adequate plaintiff" but who proposed a more favorable fee structure than did the most adequate plaintiff).

While the auction approach is meant to mimic the pricing function of a competitive market for legal services, *see Oracle*, 131 F.R.D. at 693, the PSLRA attempts to implement a market approach by leaving the selection of counsel in the hands of a unitary, experienced, and sophisticated consumer. Sophisticated consumers of legal services can evaluate prospective counsel based both on skill and cost, and can negotiate fee structures that will keep costs reasonable while providing counsel with incentives to perform excellent work.

## V. The Common Fund Doctrine After the PSLRA

No federal court of appeals has directly addressed the questions whether and to what extent the common fund doctrine survives the enactment of the PSLRA; most courts seem to have assumed that it survives intact, at least for the purposes of

analyzing lead counsel's fee requests. *See, e.g.*, *Powers v. Eichen*, 229 F.3d 1249 (9th Cir. 2000); *Wininger v. SI Management L.P.*, 301 F.3d 1115 (9th Cir. 2002); *In re Bristol-Myers Squibb Sec. Litig.*, No. 02 Civ. 2251, 2005 WL 447189 (S.D.N.Y. Feb. 24, 2005); *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436 (S.D.N.Y. 2004). In contrast, we note at the outset that the PSLRA and the common fund doctrine are in significant tension. In *Cendant I* we were emphatic that the PSLRA vests authority over counsel selection and compensation in the lead plaintiff—not in the court, and certainly not in entrepreneurial counsel who attempt to appoint themselves as representatives of the class. We should therefore not be surprised if, under the PSLRA, counsel who perform work on behalf of a class, without the approval of the court or the lead plaintiff, are shut out of any fee award. The PSLRA has shifted the balance of power away from plaintiffs' attorneys, who traditionally controlled common fund cases, to the institutional plaintiffs who now supervise securities class actions.

## A. Before Appointment of Lead Plaintiff

The common fund doctrine survives most robustly in the period running from the accrual of the cause of action to the appointment of lead plaintiff.[11] This period can be of significant

---

[11] The PSLRA requires plaintiffs who file securities class actions to publish, within 20 days of filing the complaint, a notice of the pendency of the class action to solicit prospective lead plaintiffs. 15 U.S.C. § 78u-4(a)(3)(A)(i). Putative class members may move to be considered as lead plaintiffs for 60 days after publication of the notice, § 78u-4(a)(3)(A)(i)(II), and the court must appoint a lead plaintiff within 90 days of that publication, § 78u-4(a)(3)(B)(i). The PSLRA thus contemplates a window of almost four months between filing of the first class complaints and appointment of a lead plaintiff; here, due to the numerous complaints filed between April and August 1998, and the need to consolidate those complaints, the window was closer to five months (from mid-April through early September 1998). Counsel may also perform investigative and preparatory work on behalf of a prospective class in advance of filing a complaint, though we are aware that many securities class actions are filed within days of the stock-price drops that inspire them. *See* Weiss & Beckerman, *supra*, at 2061-62.

We define this period as ending with the appointment of the lead *plaintiff*, not lead *counsel*. Here, Lead Counsel were appointed over a

importance: before lead plaintiff is appointed, counsel may discover possible fraud at the issuer, investigate that possible fraud, determine whether it warrants filing of a complaint, make strategic decisions about the form and content of the complaint, draft the complaint, file it, issue notice to class members, and navigate the PSLRA's lead-plaintiff selection procedures. These actions will often constitute a considerable fraction of the work that goes into the litigation.

At the same time, we are not blind to the realities of many securities class actions. Weiss and Beckerman give a particularly cynical view of the race to the courthouse:

> Any lawyer with access to a computer and financial databases can monitor the securities markets and wire services for major stock price moves tied to significant corporate announcements or events that may signal potential securities law claims. Upon discovering such a situation, an attorney can quickly download all of the subject company's public statements relevant to that announcement or event, together with additional information pertinent to a possible claim of securities fraud, such as whether the company made a public offering or whether

---

month after Lead Plaintiffs, although this delay was due mostly to the District Court's decision to hold an auction, a decision which we rejected in *Cendant I*. In the normal PSLRA case, lead plaintiff will likely have already retained counsel upon its appointment, and so the appointment of lead plaintiff and lead counsel will occur contemporaneously. This is not, however, an inevitability: lead plaintiff may take its time in choosing its counsel. We expect that a lead plaintiff would not be unduly dilatory in appointing counsel, but also that attorneys who do not expect to be favored by the lead plaintiff will not continue to work on behalf of the class with little prospect of reward. Moreover, a law firm that seeks compensation for doing work on behalf of a named lead plaintiff, without being retained by that lead plaintiff, comes perilously close to demanding compensation for working for an individual client who did not hire it. If such a firm does continue to work on behalf of the class, its contribution to the class should be evaluated under the standard set forth in Part V.B.1, *infra*, under which the court grants significantly greater deference to the decisions of the lead plaintiff.

insiders bought or sold stock during the period in which the firm may have suppressed or misrepresented material information. If the attorney decides there are grounds on which to file a complaint, she or her staff can use computers to incorporate quickly all such information into a complaint alleging securities fraud.

Weiss & Beckerman, *supra*, at 2061-2062 (footnotes omitted). The dominant paradigm in securities class actions is probably not careful investigation to discover hidden abuses, but rapid filing in response to abuses publicized by regulators, the media, or the issuer itself. *See, e.g.*, *Auction Houses*, 2001 WL 210697, at *3-4.

### 1. Pre-Appointment Work Generally

Nonetheless, one or more attorneys or firms will often perform substantial work on behalf of the class during the period prior to appointment of a lead plaintiff. Throughout this time, counsel will have no guarantee that their client will be appointed lead plaintiff, or that the lead plaintiff ultimately appointed will select them as lead counsel. To allow compensation of work done during this period to depend solely on the whim of the lead plaintiff could well lead to unfair and arbitrary fee decisions.

We therefore conclude that the court's involvement in the fee decision will be at its height when the fee request is for work performed before the appointment of the lead plaintiff. If an attorney creates a substantial benefit for the class in this period—by, for example, discovering wrongdoing through his or her own investigation, or by developing legal theories that are ultimately used by lead counsel in prosecuting the class action—then he or she will be entitled to compensation whether or not chosen as lead counsel. The court, not the lead plaintiff, must decide for itself what firms deserve compensation for work done on behalf of the class prior to the appointment of the lead plaintiff.

This is not to say that the court may not give substantial deference to the lead plaintiff's decision about what work conferred such benefits. Lead plaintiff will presumably have reviewed the fee requests of all attorneys who worked on behalf of the class, and may well have a better sense of what early work was useful than will the court. The court may place significant weight

on lead plaintiff's findings, but must also consider any objections proferred by those counsel left out in the cold. The approach utilized in *Bank One* has much to recommend it. Judge Shadur appointed lead counsel under the PSLRA (albeit after employing an auction), but noted that another firm had prepared the consolidated class action complaint prior to the designation of the lead plaintiff. He went on:

> It would obviously be unfair to impose that as a labor of love on the part of lawyers who thus served the common weal by providing services that benefited all of the prospective class representatives. Accordingly, if the lead plaintiffs were to elect not to make further use of the services of [that firm] (though the [lead counsel] is free to reach an understanding for their further involvement), it is expected that they will be fully compensated, whether out of any recovery or from plaintiffs collectively, for their services that antedated the designations of the lead plaintiffs and of class counsel.

*Bank One*, 96 F. Supp. 2d at 790 n.13. This approach puts the primary responsibility for compensating non-designated firms on the lead plaintiffs, but preserves the independent involvement of the court in evaluating the pre-appointment contributions of non-lead counsel.

### 2. Compensation for Filing Complaints

We think that the district courts, with the assistance of lead plaintiffs, are well equipped to decide what work during the pre-designation period actually contributed to the class's recovery. But there will always be a bone of contention as to whether non-lead counsel deserve any compensation for filing complaints. Appellant firms, and particularly FTL, cite a public policy in favor of vigorous prosecution of securities class actions. It is widely believed that such suits deter wrongdoing and promote the integrity and efficiency of the capital markets. *See* H.R. Conf. Rep. No. 104-369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 730. FTL argues that, were we to rule that non-lead counsel could not

be compensated for filing complaints, we would chill the salutary private enforcement of the securities laws.

We are considerably more sanguine about the future of securities class actions than is FTL. Given the relative ease with which plaintiffs' attorneys can learn of potential securities fraud, and the speed with which they can translate that information into a complaint, we think that attorneys will vigorously prosecute such complaints even without a guarantee of compensation. Instead, we think that the best approach is to view such complaints as entrepreneurial efforts: each firm's complaint is the price of admission to a lottery that might result in it being named lead counsel. If a firm wins that lottery, it stands to make significant fees at multiples of its lodestar. Compensating a firm for filing a complaint and not being named lead counsel would offer free tickets to the lead-counsel lottery, and would thus create incentives for redundant filings.

There is also little reason to believe that the mere filing of complaints in a securities class action ordinarily confers much benefit on the class. Such complaints are as often spurred by news reports or press releases disclosing wrongdoing—or by reports that other firms have filed complaints—as by independent investigation. Confronting a similar situation in *Auction Houses*, Judge Kaplan noted that the national media had reported on the price-fixing scandal at Christie's and Sotheby's, and dismissed the idea that the work involved in filing these complaints was compensable:

> Certainly the mere filing of complaints did not benefit the class. None of those counsel who simply jumped on the band wagon made any significant contribution to the conduct of the litigation, let alone the recovery. Each no doubt saw *The New York Times* or subsequent articles and, rather than simply advising his or her client to participate in the class action, filed an entirely duplicative complaint that served no real purpose. . . . There is no reason to compensate such piling on, much less create an economic incentive to repeat it.

2001 WL 210697, at *4.

29

We share Judge Kaplan's skepticism of copycat filings. While we agree with FTL that proper enforcement of the securities laws requires *some* incentive to file a complaint, we think that the *possibility* of being appointed lead counsel provides that incentive. Compensating every non-lead counsel for filing complaints would overincentivize such filing, and encourage the redundant "piling on" found in *Auction Houses*—and in this case, in which some sixty-two complaints were filed on behalf of the class.

The PSLRA also militates against compensating such complaints. The legislative history indicates that the PSLRA was a reaction against a race-to-the-courthouse model of securities litigation in which attorneys appointed themselves class representatives and chose their own figurehead plaintiffs who had no power to select or oversee "their" lawyers. *See* S. Rep. No. 104-98 (1995), at 11, *reprinted in* 1995 U.S.C.C.A.N. 679, 690 ("Since no deference is given to the most thoroughly researched complaint, the lawyers spend minimal time preparing complaints in securities class actions."). Allowing an attorney to generate a fee for himself simply by finding a plaintiff and filing a complaint would eviscerate the PSLRA's reforms.

In sum, we do not think that attorneys can simply manufacture fees for themselves by filing a complaint in a securities class action.[12] On the other hand, attorneys who alone discover grounds for a suit, based on their own investigation rather than on public reports, legitimately create a benefit for the class, and comport with the purposes of the securities laws. Such attorneys should generally be compensated out of the class's recovery, even if the lead plaintiff does not choose them to represent the class. More generally, attorneys whose complaints contain factual research or legal theories that lead counsel did not discover, and upon which lead counsel later rely, will have a claim on a share of the class's recovery. In most cases, as in *Bank One*,

---

[12]To be clear, we do not suggest that lead counsel and its designated assisting firms should not be compensated for the work that they put into filing the complaint. Such work is part and parcel of the effort that will eventually, in cases where the plaintiffs are victorious, result in a benefit to the class. We merely find it improper to compensate *every* firm that files a complaint, without regard to whether they contribute anything further to the class action.

we expect that lead plaintiffs who make use of earlier attorneys' legal or investigative work will request compensation for such attorneys. In the unlikely case that lead plaintiffs appropriate that work and attempt to deny compensation, we expect that the court will nonetheless reward the earlier attorney's work on behalf of the class.

We emphasize that, in determining who is entitled to attorneys' fees for pre-appointment work, the court's only consideration must be whether or not the attorney's work provided benefits to the class. The mere fact that a non-designated counsel worked diligently and competently with the goal of benefiting the class is *not* sufficient to merit compensation. Instead, only attorneys "whose efforts create, discover, increase, or preserve" the class's ultimate recovery will merit compensation from that recovery. *GMC*, 55 F.3d at 820 n.39. To the extent that the Tenth Circuit's pre-PSLRA decision in *Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994), is in tension with this holding, we reject *Gottlieb*'s suggestion that duplicative but useful work will always be compensable, and that "the quality of the attorneys' legal services" will be somehow dispositive. *See* 43 F.3d at 489; *see also supra* Part IV.A.2.

If a hundred lawyers each perform admirable but identical work on behalf of a class before the appointment of the lead plaintiff, the court should not award fees to each of the lawyers, as this would overincentivize duplicative work. Instead, while all of lead counsel's work will likely be compensable, *see supra* note 12, other attorneys who merely duplicated that work—however noble their intentions, however diligent their efforts, and however outstanding their product—will not be entitled to compensation. Only those who confer an independent benefit upon the class will merit compensation.

To summarize, responsibility for determining fees for the work of non-lead counsel performed before the appointment of the lead plaintiff will rest, in the first instance, with the district court, though that court may ask the lead plaintiff for guidance in evaluating claims for fees. Only work that actually confers a benefit on the class will be compensable; in the ordinary case, simply filing a complaint that is substantially identical to other complaints will not by itself warrant compensation.

*B. After Appointment of Lead Plaintiff*

After a lead plaintiff is appointed, however, the primary responsibility for compensation shifts from the court to that lead plaintiff, subject of course to ultimate court approval. The PSLRA lead plaintiff is the decisionmaker for the class, deciding which lawyers will represent the class and how they will be paid.

1. In General

The PSLRA lead plaintiff chooses the class's lawyer: "The most adequate [i.e., lead] plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v). From the point of view of the PSLRA, the lead plaintiff *is* the client, and the attorney-client relationship is, in the first instance, the relationship between lead counsel and lead plaintiff.

The PSLRA's legislative history also demonstrates that it was intended to create something akin to a traditional attorney-client relationship in the securities class action context. *See* S. Rep. No. 104-98, at 10 (1995) ("[T]he lead plaintiff—not lawyers—should drive the litigation. As one witness testified: 'One way of addressing this problem is to restore lawyers and clients to their traditional roles by making it harder for lawyers to invent a suit and then attach a plaintiff.'") (quoting testimony of Mark E. Lackritz), *reprinted in* 1995 U.S.C.C.A.N. 679, 689; *see also* Weiss & Beckerman, *supra*, at 2105-07; Harel & Stein, *supra*, at 103-04. Under this traditional model, the lead plaintiff is treated like any other private plaintiff, and is free to select lead counsel, negotiate a compensation structure, monitor counsel's efforts, and make decisions about "the objectives of representation," particularly settlement decisions. Model Rules of Prof'l Conduct R. 1.2(a) (1983).

Viewed from this perspective, non-lead-counsel's claims to recover under the common fund doctrine may appear untoward. In normal circumstances, an individual client is free to select his own counsel, and another lawyer, not retained by the client, could not manufacture a fee for himself by claiming to work on behalf of the client. Such an officious intermeddler would be laughed out of court if he asked the client for compensation for work never

requested by that client.[13]

On the other hand, while the PSLRA certainly represents a shift toward the traditional attorney-client relationship, it has not wholly adopted that paradigm. Securities class actions are still class actions, and the court retains the power to award fees. *See* Fed. R. Civ. P. 23(h) ("In an action certified as a class action, the court may award reasonable attorney fees . . . ."). And courts would be remiss if they abdicated all responsibility to the lead plaintiffs. The lead plaintiff is not the sole client in a PSLRA class action; instead, the lead plaintiff serves as a fiduciary for the entire class. A court must therefore retain oversight over lead plaintiff's compensation decisions in order to ensure that the lead plaintiff has fulfilled its fiduciary duties.

Furthermore, the lead plaintiff, and indeed the entire class, has an incentive to deny compensation to non-lead counsel. Any such compensation will normally come directly out of the class's recovery, and the PSLRA ensures that the lead plaintiff has a large stake in that recovery. Any compensation paid to non-lead counsel may substantially reduce the recovery of the lead plaintiffs.[14] Thus the lead plaintiff will have a direct financial interest in keeping down the fees of non-lead counsel. On the other hand, we think those incentives will be kept in check by the fact that lead plaintiffs

---

[13]*Cf. Cosgrove v. Bartolotta*, 150 F.3d 729, 734 (7th Cir. 1998) ("When one person confers a benefit on another in circumstances in which the benefactor reasonably believes that he will be paid—that is, when the benefit is not rendered gratuitously, as by an officious intermeddler, or donatively, as by an altruist or friend or relative—then he is entitled to demand the restitution of the market value of the benefit if the recipient refuses to pay."). An attorney could not reasonably believe that a client who had not retained him would pay him for his efforts; he would be a mere intermeddler.

[14]In their examination of twenty settled securities class actions, Weiss and Beckerman found that the single largest claimant held between 3.1% and 34.0% of the total claims in each suit. Weiss & Beckerman, *supra*, at 2089-90 tbl.2. Assuming that plaintiffs recover in proportion to their losses, and that counsel fees come out of all plaintiffs' recovery pro rata, this means that a dollar in counsel fees would have cost the single lead plaintiffs in those cases anywhere from three to thirty-four cents.

33

and lead counsel are likely to be repeat players in the securities class action business. They will therefore want to develop a reputation for fair dealing—especially since lead counsel in one class action are likely to be non-lead counsel in another, and will therefore want to maintain good relations with the rest of the securities plaintiffs' bar. Similarly, CalPERS will have an incentive to appropriately compensate any work done by Miller Faucher that increased its recovery in this case, because it will want to be able to rely on Miller Faucher to represent its interests in the next case in which Miller Faucher is lead counsel. In short, the PSLRA's focus on putting the power over securities lawsuits in the hands of repeat players will provide incentives for all concerned to play fair.

We believe that *Cendant I* can be adapted to provide the appropriate standard for the court to use in evaluating fee requests by non-lead counsel. In *Cendant I*, we held that

> courts should accord a presumption of reasonableness to any fee request submitted pursuant to a retainer agreement that was entered into between a properly-selected lead plaintiff and a properly-selected lead counsel. . . . This presumption will ensure that the lead plaintiff, not the court, functions as the class's primary agent vis-à-vis its lawyers.

264 F.3d at 282. The paramount goal, here as in *Cendant I*, is to give the lead plaintiff, not the court, authority over class counsel. This goal is served by according an equivalent presumption of correctness to lead plaintiff's decision that *non*-lead counsel's work, *not* pursuant to a retainer agreement between counsel and the lead plaintiff, is *not* entitled to any fees paid out of the class's recovery. We thus conclude that any attorney who wishes to be compensated out of the plaintiff class's recovery in a class action governed by the PSLRA must submit his fee requests to the PSLRA lead plaintiff, and that the district court should accord a presumption of correctness to lead plaintiff's decision that such an attorney is not entitled to fees.

Of course, "[s]aying that there is a presumption necessarily assumes that it can be overcome in some cases." *Cendant I*, 264 F.3d at 282. In *Cendant I*, we noted several factors that might rebut the presumption that fees agreed to by lead counsel pursuant to a

retainer agreement are reasonable. If "the assumptions underlying the original retainer agreement had been materially altered" by unforeseeable developments, or if a prima facie case was made by objectors that the agreed-to fee was "clearly excessive" under a modified *Gunter* inquiry, then the presumption of reasonableness would be rebutted, and the court would have to "review the fee request using the traditional standards." 264 F.3d at 282-83.

These rebuttal factors do not seem particularly relevant in the case of a lead plaintiff's denial of fees to non-lead counsel. With no retainer agreement, there can be no real evidence of the initial assumptions underlying the litigation, and an excessiveness inquiry will be irrelevant to the question whether non-lead counsel deserve any fees in the first place. Instead, we think that the presumption of correctness afforded to lead plaintiff's denial of fees to non-lead counsel can be refuted in one of two general ways.

First, non-lead counsel can refute the presumption by affirmatively demonstrating some failure in lead plaintiff's fiduciary representation of the class. A fiduciary traditionally owes a duty of loyalty and a duty of care. *See, e.g.*, *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 75 (1991). Non-lead counsel might thus refute the presumption by demonstrating a defect in either duty, i.e., by showing that (1) lead plaintiff's denial of fees was motivated by some factor other than the best interests of the class, or (2) lead plaintiff did not carefully consider and reasonably investigate non-lead counsel's request for fees. If non-lead counsel could demonstrate either of these failures, then a court could conclude that lead plaintiff has not performed its fiduciary duties as mandated by the PSLRA and is not entitled to any deference in the determination of counsel fees. At this point, of course, non-lead counsel will still need to demonstrate to the court's satisfaction that its work did benefit the class, under traditional common fund standards.

Second, non-lead counsel can refute the presumption, even in cases where lead plaintiff has faithfully discharged its fiduciary duties, simply by demonstrating that lead plaintiff's denial of fees was erroneous—that is, by clearly proving that non-lead counsel reasonably performed work that independently benefited the class. But, given our stated deference to lead plaintiff's managerial decisions, the standard for such a demonstration will be high. Non-lead counsel will need to prove by clear evidence that (1) they

35

performed work on behalf of the class, (2) they did so with some reasonable expectation of being compensated out of the class's common-fund recovery, and (3) their work led to identifiable benefits to the class that would not have been obtained by the work of lead counsel.

The first factor will normally be demonstrated simply enough, by a showing that counsel devoted hours to a prosecution of the claim. But mere quantity of work—and, indeed, quality of work—will not be enough for compensation; the other two factors must also be met. The second factor is designed to distinguish deserving firms from officious intermeddlers, and can be met most easily by some proof that lead plaintiff (or lead counsel) requested the assistance of the non-lead counsel firm.[15] On the other hand, even in cases where no such proof is forthcoming, non-lead counsel may be able to show a reasonable expectation of compensation due to a lead counsel's, or the court's, acquiescence in its efforts.[16]

The third factor is related to the traditional common fund test: did counsel's efforts confer a benefit upon the class? Here, however, counsel's proof must be specific: it must show what its efforts were, how they created a benefit, and why that benefit would not have been created absent its efforts. If both lead counsel and the fee-requesting non-lead counsel performed work in parallel, non-lead counsel will not be able to carry this third factor merely by demonstrating that its work was in some subjective way better. Only if it can demonstrate that its work alone was responsible for some demonstrably improved probability of victory, or some identifiable portion of the class's recovery, can non-lead

---

[15]Of course, counsel must demonstrate that they had a reasonable expectation to be compensated out of the *class's* recovery. The fact that an individual client requested their assistance indicates no more than a possible expectation that *that client* would compensate them.

[16]The extent of proof required on the second factor may vary inversely with the extent of the benefit conferred under the third factor. Indeed, it is conceivable that a pure intermeddler may be entitled to compensation if it can convincingly prove that its efforts were solely responsible for a large recovery for the class, although we expect that such cases will be rare.

counsel claim a right to fees from the common fund.

We think that this rebuttable presumption in favor of lead plaintiff's decision not to compensate non-lead counsel will serve for the majority of cases.[17] However, we turn to a few situations

[17]Our conclusions about the role of lead plaintiff in compensating non-lead counsel may seem to be in some tension with our precedents on the compensation of objectors' counsel. In *Cendant PRIDES*, we stated the standard for evaluating fee requests from objectors' counsel: the district court has "broad discretion" in deciding what fees to award, based on its own evaluation of whether the objector "assisted the court and enhanced the [class's] recovery." 243 F.3d at 743 (quoting *White v. Auerbach*, 500 F.2d 822, 828 (2d Cir. 1974)). That standard differs from the standard, set forth in the text, applicable to fee requests from counsel for non-objecting class members. We briefly explain why the two standards differ.

First, a court can usually determine whether an objector has improved the class's recovery, and can often measure the amount of that improvement. If the objection is meritorious, it will usually lead to an increase in the settlement, a reallocation of the award among different plaintiffs, or a decrease in the fees paid to lead counsel. The court will thus be able to measure the dollar value of the objector's contribution to the class's net recovery. Furthermore, because the objector makes his objection to the court, rather than merely negotiating with lead counsel, the court can easily evaluate not only the quality of the objector's work but also the impact it had on the court's ultimate decision. On the other hand, a district court will not easily be able to determine how much non-lead counsel's efforts, as opposed to lead counsel's independent work, contributed to the final work product, and it will be even harder pressed to attach a dollar value to that contribution. Lead plaintiffs, in consultation with lead counsel, will be much better equipped to evaluate these questions. *See In re Ampicillin Antitrust Litig.*, 81 F.R.D. 395, 400 (D.D.C. 1978) ("[I]t is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk.").

Second, if we applied the standard developed above to objectors, a lead plaintiff would have significant incentives to deny fees to even deserving objectors' counsel. A successful objection will often reduce lead plaintiff's share of the settlement, or lead counsel's fee award. Lead plaintiff and lead counsel would thus have an incentive to punish successful objectors by withholding fees. In contrast, lead plaintiffs and lead counsel will want, at least *ex ante*, to encourage counsel for other

37

### 2. Representation of Individual Class Members

First and foremost, non-lead counsel cannot expect to be compensated out of the class's recovery for "monitoring" the work of lead counsel on behalf of individual clients. If, in the course of such "monitoring," counsel discover new facts or legal theories that might help the class, they can present their discoveries to lead counsel and may be eligible for compensation if their work in fact improves the class's recovery. But we cannot see how the monitoring itself benefits the class as a whole, as opposed to the attorney's individual client. We are thus in complete agreement with Judge Kaplan in *Auction Houses*:

> Nor is there any reason for the class as a whole to compensate large numbers of lawyers for individual class members for keeping abreast of the case on behalf of their individual clients, keeping their individual clients informed, or duplicating the efforts of lead counsel. If individual class members wished to have the services of additional counsel in addition to class counsel, they should bear the expense themselves.

2001 WL 210697, at *4.

### 3. Representation of Uncertified Subclasses

A similar but somewhat more complex issue arises when non-designated counsel act on behalf not of an individual client (or an identifiable group of clients), but of a putative but uncertified subclass. Here, the attorney claims to represent not only an individual client (who is free to pay counsel fees himself), but a subgroup whose share of the class's total recovery may be said to constitute a common fund in itself.

A district court hearing a class action has the discretion to

---

class members to assist their efforts and increase the class's recovery. They will thus have incentives to evaluate non-lead counsel's assistive work fairly, and to compensate that work when it actually contributes to the class's recovery.

divide the class into subclasses and certify each subclass separately. *See* Fed. R. Civ. P. 23(c)(4)(B). This option is designed to prevent conflicts of interest in class representation: a lead counsel might have difficult representing, for example, a class comprising both ordinary shareholders and large shareholders who also serve as directors. Indeed, in this case the District Court created a subclass of Cendant Feline PRIDES purchasers because those purchasers' interests in the suit conflicted with the interests of Cendant equity purchasers. *See Cendant PRIDES*, 243 F.3d at 725.

While subclasses can be useful in preventing conflicts of interest, they have their drawbacks. One leading expert writes:

> [I]f subclassing is required for each material legal or economic difference that distinguishes class members, the Balkanization of the class action is threatened. Such a fragmented class might be unmanageable, certainly would reduce the economic incentives for legal entrepreneurs to act as private attorneys general, and could be extremely difficult to settle if each subclass (and its attorney) had an incentive to hold out for more.

John C. Coffee Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 Colum. L. Rev. 370, 398 (2000). In short, a class action containing a multitude of subclasses loses many of the benefits of the class action format.

Recognizing that the decision whether to certify a subclass requires a balancing of costs and benefits that can best be performed by a district judge who is familiar with the management of the case, we have held that "the district court has considerable discretion in utilizing subclasses under rule 23(c)(4)(B)." *Alexander v. Gino's, Inc.*, 621 F.2d 71, 75 (3d Cir. 1980); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 184-185 (1974) (Douglas, J., dissenting); *Diaz v. Romer*, 961 F.2d 1508, 1511 (10th Cir. 1992). Where the district court has declined to certify a subclass, we will ordinarily defer to its decision unless it constituted an abuse of discretion.

Furthermore, the PSLRA provides additional reasons to use subclassification sparingly. As the District Court noted in an ealier

phase of this case, overuse of subclasses

> would injure the purpose of the PSLRA by
> fragmenting the plaintiff class and decreasing client
> control. . . . "Increasing the number of Lead
> Plaintiffs would detract from the Reform Act's
> fundamental goal of client control as it would
> inevitably delegate more control and responsibility to
> the lawyers for the class and make the class
> representatives more reliant on the lawyers."

*In re Cendant Corp. Litig.*, 182 F.R.D. 476, 480 (D.N.J.,1998) (quoting *Gluck v. Cellstar Corp.*, 976 F. Supp. 542, 549 (N.D. Tex. 1997)). This case provides a good illustration of the difficulties: while the PSLRA "most adequate plaintiff" for the main purchaser class was a consortium of the country's largest pension funds, the putative lead plaintiffs for the stub-purchaser subclass were two individuals (Lewis and Casnoff) with a combined holding of 375 shares of Cendant stock, purchased for a total of about $9,000. Appointing such small-stakes claimants as lead plaintiffs, merely because their lawyers have carved out a subclass for them, might defeat much of the purpose of the PSLRA.

At all events, once a court has declined to certify a putative subclass, it should look upon an attorney's claims to represent that subclass with skepticism. As we have developed above, the PSLRA limits an attorney's ability to claim fees under the common fund doctrine for work done on behalf of a plaintiff class for which he or she is not the designated lead counsel. It would be strange if such an attorney could avoid those restrictions by appointing himself the protector of a putative subclass that the court has not certified. Once a lead plaintiff has been appointed, that plaintiff should be deemed to speak for the entire class—as, indeed, the lead plaintiff has a fiduciary duty to represent all class members fairly.

We therefore conclude that non-lead counsel deserve no special consideration for advocating for the interests of an uncertified subclass of a PSLRA plaintiff class. We expect the lead plaintiff to properly represent the entire class, and the presumption of correctness that we award to its decision not to compensate an attorney will also extend to a decision not to compensate purported counsel for an uncertified subclass. That said, however, the

presumption remains rebuttable. If the non-lead counsel can prove that the lead plaintiff violated its fiduciary duties by unfairly favoring some class members over others, then of course counsel will be entitled to compensation for representing the interests of the disfavored group, though we expect that such proof will be rare.

In the less egregious case, however, in which non-lead counsel's advocacy on behalf of the uncertified subclass improves that subclass's recovery (quite possibly at the expense of other members of the broader class), we do not think that the attorney will automatically be entitled to compensation from the subclass on a common fund theory. The attorney has not been hired by anyone, or appointed by the court, to represent the subclass. If he increases the subclass's recovery, he does so only as an officious intermeddler. He may well be entitled to compensation from his own individual client for his work on the allocation of the recovery, but, given the PSLRA's strict and formalized process for appointing class (and thus subclass) counsel, we do not think that a self-appointed representative of an uncertified subclass should have any claim on that subclass's recovery.

On the other hand, if such an attorney succeeds in effecting a significant change in the allocation of damages, this may constitute some evidence that the lead plaintiff's initial allocation was not fair to all class members, and may thus serve to rebut the presumption that the lead plaintiff properly represented the entire class. The result will depend on the facts—an attorney who improves a group's share of the recovery by pestering or threatening the lead plaintiff cannot point to his accomplishment to rebut the presumption, while an attorney who improves his group's share by pointing out to the court the unfairness of the lead plaintiff's initial allocation may very well overcome the presumption.

## VI. The Finkelstein, Thompson & Loughran Appeal

The standards set forth above quickly dispose of FTL's request for fees. FTL confesses in its brief that its "role in this litigation was confined almost entirely to pre-filing investigation and drafting, monitoring and client communications." These activities are not compensable.

Insofar as FTL requests compensation for its investigation

and drafting of a complaint on behalf of Alfred Wise, its claims are foreclosed by our analysis in Part V.A.2, *supra*. FTL's complaint was the fifty-fifth purported class complaint filed in this action. We do not question the time that FTL put into preparing its filings; nor do we doubt the quality and legal sophistication of its thorough complaint. Our review of the FTL complaint, however, leads us to the conclusion that its factual allegations were similar to those of the other fifty-plus complaints filed in this case, and were based essentially on Cendant's own public announcements. FTL does not claim to have taken any investigative action prior to Cendant's April 15, 1998, disclosure of its accounting irregularities. As Judge Kaplan said in similar circumstances:

> [T]his was not [a] . . . violation ferreted out by industrious counsel who invested substantial time and effort against a chance of success. This was much more like finding a pot of gold in the middle of the sidewalk.

*Auction Houses*, 2001 WL 210697, at *3.

Similarly, FTL does not allege, and we do not find, that the legal theories advanced in its complaint were substantially different from those advanced in other complaints, or that FTL's legal theories in any way influenced Lead Counsel's handling of the case. Thus, there is no reason to find that FTL increased the class's recovery by investigating, drafting, and filing its complaint. This work was therefore not compensable.

Conversely, insofar as FTL claims compensation for monitoring the progress of the suit on behalf of its client, Mr. Wise, it cannot recover under our analysis in Part V.B.2, *supra*. Such monitoring was consistent with FTL's obligations to Mr. Wise, *see* Model Rules of Prof'l Conduct R. 1.4(a)(3) (1983), and we have no doubt that FTL ably represented his interests. FTL might therefore be entitled to compensation from him.[18] But FTL can point to no

---

[18]We have no information regarding FTL's retainer agreement with Mr. Wise, and so we of course take no position on whether FTL is actually entitled to a fee from Mr. Wise. We note, however, that Mr. Wise's interest in this litigation was necessarily limited to the some $18,500 that he had invested in Cendant stock; we doubt that anyone

42

specific benefit that its monitoring activities conferred on the plaintiff class as a whole, and therefore cannot expect to be compensated out of the class's recovery.

We recognize that FTL put significant time and effort into preparing its complaint. We think it clear, however, that it did so as an entrepreneurial effort, hoping to get at least some share of the lead-counsel work on behalf of the class. There is nothing unseemly about this, but there is simply no evidence that it benefited the class. FTL can thus have no expectation of receiving attorneys' fees out of the class's recovery.

## VII. The Miller Faucher and Wolf Haldenstein Appeals

Miller Faucher and Wolf Haldenstein present more difficult issues. The complaints that they filed were not mere piling-on; they were the first (and only) firms to file initial complaints on behalf of "stub period" plaintiffs. Furthermore, unlike FTL, they were involved in the Cendant litigation beyond the initial filing of the complaint, as they consistently advocated for their individual clients and, allegedly, for the uncertified subclass of stub-period claimants.

### A. Filing Stub-Period Complaints

Like FTL, Wolf Haldenstein and Miller Faucher argue that they should be compensated for filing initial complaints in the Cendant litigation. Also like FTL, these firms came late to the table: their complaints were filed in July 1998, over a month after the first fifty-two Cendant complaints had been consolidated into a single class action. But the complaints filed by Wolf Haldenstein and Miller Faucher did not allege facts and legal theories identical to those alleged in the previous complaints. Rather, these firms purported to represent the "stub purchasers" who bought Cendant stock *after* the company's initial April 15, 1998, disclosure of wrongdoing. The stub plaintiffs alleged that this initial disclosure was itself materially misleading, and was therefore a separate securities fraud.

As we have explained, the mere fact of filing a class-action

expects him to pay FTL's claimed $45,000 fee out of his modest recovery in the underlying lawsuit.

complaint will not necessarily entitle a firm to PSLRA attorneys' fees. *See supra* Part V.A.2. Nonetheless, we agree with the long line of common fund cases that hold that attorneys "whose efforts create, discover, increase, or preserve a [common] fund," *GMC*, 55 F.3d at 820 n.39, are entitled to compensation. Thus, an attorney who discovers a valid claim on behalf of a class, and makes use of his findings in a complaint that ultimately enhances the class's recovery, will be entitled to compensation out of that recovery.

Wolf Haldenstein and Miller Faucher argue that they identified the stub class and introduced it into the litigation. Wolf Haldenstein, in particular, stresses that it was the first firm to file a stub-period class claim; in a sense, it might be said that Wolf Haldenstein "discovered" the stub-period claim. Wolf Haldenstein argues that it is therefore entitled to common-fund fees.

We think that this argument misunderstands the requirement that an attorney discover or create the common fund. Such "discovery" is only compensable if it is a true discovery: if the attorney's investigation uncovers facts, or leads to legal theories, that benefit the class independently of work done by other counsel. Simply being the first to allege facts that appear in the newspapers, or to advance a legal theory that is apparent to all lawyers involved, will not in itself be enough to warrant compensation.

In this case, discovering that the April disclosure was misleading—and thus that Cendant shareholders who bought after April 15 but before July 14 would have a § 10(b) cause of action—required no more effort or ingenuity than reading the *Wall Street Journal*. Given the July 14 disclosure, it is virtually inconceivable that the previously filed class actions would not eventually have been amended to include the April-to-July period. Wolf Haldenstein's complaint—filed on July 16, 1998, two days after Cendant's second disclosure—was the first to make claims for the April-to-July purchasers, and Miller Faucher's was the second (filed July 20), but it would be totally implausible to therefore conclude that Wolf Haldenstein and Miller Faucher were the only firms to think of making such claims. Similarly, we cannot infer that the appellant firms' initial complaints had any influence on the Amended Complaint ultimately filed by Lead Counsel.

Daniel Berger, of Lead Counsel firm Bernstein Litowitz, argued as much before the District Court. Berger noted that the initial complaints were filed in April 1998, and that the time

between April and October was taken up by procedural motions, motions to consolidate, and applications for appointment as lead counsel. Therefore, no amended complaint was filed during that time, because no firm yet represented the class. But Lead Counsel's institutional clients had made post-April 15 purchases, and therefore had an interest in bringing stub-period claims. Furthermore, the July 14 disclosure also turned out to be incomplete, and the Cendant fraud was only fully revealed on August 28—thus creating a third class period, for July-to-August purchasers, that Wolf Haldenstein and Miller Faucher did not identify, but that Lead Counsel also litigated. Lead Counsel's Amended Complaint was not filed until December; that complaint included all purchases (including the stub-period claims) extending through August 28.

The District Court accepted Berger's argument and found that Wolf Haldenstein's and Miller Faucher's complaints did not constitute a discovery of a new cause of action. In denying fees to Miller Faucher, that Court noted:

> Frankly the matter was in flux. . . . [T]he Court determined also that the amended complaint . . . should abide until December. Officially things were in flux and as Mr. Berger points out the pleadings were in flux.
>
> The class period eventually was May 1995 to August 28, 1998. The amended complaint was filed incorporating those claims about which Mr. Faucher has concern. The Court had concern and indicated in its appointment of lead counsel in denying the attempt to have a separate class, that lead counsel was well qualified to handle any and all claims of that nature [i.e. stub claims], particularly since, as pointed out by Mr. Berger, the lead plaintiffs themselves had claims of that nature.

We find no error in this determination. Appellant firms' suggestion that, without their complaints, no one would have discovered and filed the stub-plaintiff claims is simply unpersuasive. *Cf. Silberman v. Bogle*, 683 F.2d 62, 65 (3d Cir. 1982) (rejecting fee award for attorneys' intervention in an SEC action, because the attorneys

"have not shown that the SEC decision would have been less favorable to the fund but for their participation"). Lead Counsel were clearly aware of the stub claims, and prosecuted them vigorously and successfully.

As Miller Faucher and Wolf Haldenstein's initial complaints did not truly create or discover a cause of action, they can have no claim for compensation under the common fund doctrine for the work that they conducted prior to the appointment of Lead Plaintiffs for for the class.

### B. Improving the Pleading of Stub-Period Allegations

The stub-period appellant firms also argue that they corresponded with Lead Counsel after the appointment of Lead Plaintiffs, and that this correspondence led to improvements in the pleadings that benefited the class. As we have explained, *see supra* Part V.B.1, we presume that a lead plaintiff will correctly determine compensation for lawyers who perform work on behalf of the class after its appointment. Here, the CalPERS funds were appointed Lead Plaintiffs on September 4, 1998, and we grant considerable deference to their decisions on compensation for work done after that date. The Lead Plaintiff funds did not compensate appellant firms, and filed a declaration, signed by their respective general counsels, stating that those firms' work was neither requested by Lead Plaintiffs nor beneficial to the class as a whole.

Thus, appellant firms face a difficult task in proving that they deserve fees for improving the pleadings. As explained above, *see supra* Part V.B.1, they must either (1) demonstrate that Lead Plaintiffs' denial of fees was a breach of its fiduciary duties to the class, or (2) prove that they did work on behalf of the class, with a reasonable expectation that they would be compensated, that increased the class's recovery beyond that obtained through the efforts of Lead Counsel. As no one has alleged any fiduciary breach by Lead Plaintiffs, and as we are satisfied that Lead Plaintiffs carefully reviewed all fee applications and awarded fees to those firms whose work they believe to have benefited the class, we focus on the second prong of our test, and ask whether appellant firms have proven that they reasonably did work that caused a demonstrable improvement in the class's recovery.

### 1. Wolf Haldenstein

On October 30, 1998, Lead Counsel wrote to counsel for all class members—including appellant firms, who continued to represent their individual clients after the appointment of the Lead Plaintiffs—asking if their clients wished to be named in the consolidated complaint. Wolf Haldenstein's response was a two-page letter, dated November 18, 1998, that mentioned "a couple of pleading issues that need to be worked out vis-a-vis the stub period." Wolf Haldenstein suggested that different methods of pleading—alleging a unitary class period versus alleging distinct subclasses—might lead to different damages calculations. It also suggested "pleading scienter as to officers who had presided over the underlying fraud going back to 1995 [to] make[] the stub period claim somewhat more palatable."

Lead Counsel does not seem to have responded to these suggestions. On December 8, 1998, Lead Counsel circulated a preliminary draft of the Amended Complaint to counsel for all class members. Lead Counsel's letter accompanying this draft stated that the complaint was enclosed "for your and your client's review," though it did not actually request comments.

Wolf Haldenstein alleges that Lead Counsel's two letters were intended to solicit its suggestions for improvements to the pleadings. This is a fairly charitable way of reading the letters; at all events, Wolf Haldenstein does not detail what comments it offered. It does not seem to have marked up the Amended Complaint, and its only response to the circulating complaint in the record is a December 11, 1998, letter certifying its client Jeff Mathis as a named plaintiff.

Lead Counsel deny requesting suggestions from Wolf Haldenstein, and represent that they did not receive any comments or suggestions regarding the circulating Amended Complaint. Wolf Haldenstein's sketchy allegation that it improved the pleadings, and the vague and unasked-for special-interest suggestions of its November 18 letter, are not enough to overcome the presumption of correctness that we grant to Lead Plaintiffs' decisions about counsel fees. Wolf Haldenstein has not pointed to any particular suggestions that were accepted by Lead Counsel and that improved the Amended Complaint, and it certainly has done nothing to prove that its suggestions increased the class's recovery. While we accept that Wolf Haldenstein did work on behalf of the class, we find no indication that the firm had any reasonable expectation of

compensation, or that its efforts independently benefited the class. We therefore find no reason to disagree with the Lead Plaintiffs' refusal to compensate Wolf Haldenstein for its suggestions.

### 2. Miller Faucher

Miller Faucher's contributions give us more pause. Like Wolf Haldenstein, Miller Faucher received the circulating Amended Complaint on December 8, 1998. Unlike Wolf Haldenstein, however, Miller Faucher replied with two comments that were included in the final Amended Complaint filed with the District Court. These comments were incorporated in a December 11, 1998, letter from Miller Faucher partner J. Dennis Faucher to Lead Counsel partner Daniel Berger. Faucher's letter read, in pertinent part:

> Your draft of the amended and consolidated complaint does not adequately assert the claim of class members who purchased after April 15, 1998. Specifically, the problem areas are as follows:
> 1. Paragraph 8 should specify the drop that occurred after the July 14, 1998 disclosure. My recollection is that the drop was approximately 20 percent.
> 2. Paragraph 48 and section B (paragraphs 83-85). I could not find any allegation that the April 15 disclosure was materially false and misleading nor an explanation of what should have been disclosed.

Faucher added that Berger should read Miller Faucher's and Wolf Haldenstein's complaints "[f]or inspiration" in redrafting the Amended Complaint.

Lead Counsel apparently did take some inspiration from this letter, as the Amended Complaint filed on December 14 alleged that the April 15, 1998, disclosure contained materially false and misleading assertions. Lead Counsel concede that Faucher proposed some "word changes . . . in the consolidated complaint . . . that we thought were beneficial" and therefore adopted. But the changes to the complaint do not appear to have been great—the April 15 disclosure is mentioned only in a string of other allegedly misleading press releases, and, in our review of the 152-page

48

Amended Complaint, we have not discovered any other mention of that disclosure, any specification of the share-price drop following the July 14 disclosure, or any explanation of what should have been disclosed in April.

Furthermore, as Lead Counsel noted at oral argument, these issues were more fully fleshed out in response to defendants' motions to dismiss. The District Court initially concluded (in a decision taken prior to appointment of the Lead Plaintiffs) that purchasers could not reasonably have relied on any misrepresentations in the April 15, 1998, disclosures, thus preventing any recovery for stub-period purchasers. *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 47 F. Supp. 2d 546, 556 (D.N.J. 1999). When the District Court modified that conclusion and allowed the stub-period claims to go forward, *see In re Cendant Corp. Litig.*, 60 F. Supp. 2d 354, 374-76 (D.N.J. 1999), its modification was influenced by supplemental briefs filed by Lead Counsel and by counsel for the Cendant PRIDES plaintiffs, *see id.* at 374-75, and appellant firms were not significantly involved.[19] Miller Faucher's suggested improvements to the Amended Complaint thus do not seem to have had much of an effect on the actual progress of the litigation; the heavy lifting involved in prosecuting those claims occurred later, and was performed by Lead Counsel.

Turning to our tripartite test set out above, *see supra* Part V.B.1, we conclude that Miller Faucher clearly performed work on behalf of the class. We also think that Miller Faucher probably had

---

[19]Miller Faucher partner J. Dennis Faucher did allege that, "when the briefing occurred on Defendants' Motions to Dismiss, I again called and wrote lead counsel to discuss revisions to the draft relating to treatment of these claims. Various revisions were made, which again, in my view, advanced both the claims of the partial disclosure period purchasers, and the claims of the class as a whole." Miller Faucher has, however, submitted no evidence of the character and extent of its suggestions that would clearly demonstrate that the suggestions benefited the class. At oral argument, Lead Counsel strongly suggested that its own work, not Miller Faucher's, led to the successful opposition to the motions to dismiss, and Miller Faucher relied mainly on its suggested improvements to the complaint. We do not find Faucher's declaration a convincing reason to reject the District Court's finding that the significant work was done by Lead Counsel.

some reasonable expectation of compensation: while Lead Counsel does not appear actually to have solicited its comments, those comments were reasonably made in response to the circulating complaint, and Lead Counsel did accept at least one of those comments and incorporate it into the draft submitted to the court.

Nonetheless, Miller Faucher's appeal founders on the third part of our test: the firm has not demonstrated, and in our view cannot demonstrate, that its efforts independently benefited the class. It seems certain that Miller Faucher's minor edits to the Amended Complaint had little effect on the final form of that Complaint and none whatsoever on the final settlement in this case. Instead, it was Lead Counsel's enormous efforts, both in its initial Amended Complaint on behalf of the entire class and in its later opposition to the motions to dismiss, which preserved the recovery of the post-April 15 plaintiffs, that created the benefits to the class.

The District Court found that

> there was gratuitous activity, but there is nothing to indicate that such activity was sought by lead plaintiff, nor is there and I do not find that lead plaintiff nor lead counsel needed the legal assistance of this claimant [Miller Faucher]. Lead counsel was eminently qualified to handle this matter.

We agree. Lead Counsel's handling of the case was thorough, expert, and extraordinarily successful. Their work was not perfect, and Miller Faucher improved it slightly. But this improvement was immaterial in the overall context of the case. Lead Counsel's efforts, not the addition of the April 15 press release to the Amended Complaint's list of misleading statements, led to the plaintiff class's gigantic recovery.

Lead Plaintiffs' decision not to award fees to Miller Faucher for its work on the Amended Complaint, although perhaps open to debate, was not clearly wrong. Miller Faucher has not refuted the presumption in favor of Lead Plaintiffs' decision, and so we cannot order the District Court to grant it fees.

### C. Monitoring the Settlement Allocation

Finally, Miller Faucher and Wolf Haldenstein argue that they monitored the settlement of the case, and took steps to

50

increase the stub plaintiffs' allocative share of the settlement. They claim that even if they did not increase the recovery of the class as a whole, at the least they improved the position of the stub plaintiffs. Presumably, then, they believe that they should be compensated out of the common fund consisting of those plaintiffs' recovery.

Miller Faucher's claimed involvement in the settlement did not extend beyond general "monitoring" activities on behalf of its individual client. Such efforts cannot be compensated out of the common fund. *See supra* Parts V.B.2 & VI. Wolf Haldenstein, on the other hand, took a variety of steps to represent the interests of the stub-period plaintiffs, including hiring a damages expert to calculate a fair compensation scheme. These steps require a more detailed analysis.

1. The Uncertified Subclass

While Wolf Haldenstein purported to represent a subclass of April-15-to-July-14 purchasers, that subclass was never an official part of this litigation. In response to Miller Faucher's and Wolf Haldenstein's motions to "clarify" the consolidation order, the District Court specifically refused to certify the stub subclass. It found that the stub plaintiffs named the same defendants as the rest of the plaintiffs, and that they alleged the same legal theories and the same facts as the rest of the class, except for the fact that they added an allegation that the April 15 statement was misleading. *See* 182 F.R.D. at 479. Given the overwhelming similarities between the two groups, the District Court saw no need to define a separate stub-period subclass. No one now directly questions the District Court's refusal to create a subclass, and we think that that decision was clearly justified.

The District Court characterized Wolf Haldenstein's request for fees as an attempt to reargue the motion to create a separate subclass with a separate lead plaintiff. This comment was not off the mark. Wolf Haldenstein viewed itself as lead counsel for a subclass of stub-period plaintiffs, and attempted to represent the interests of that subclass in the debates over the allocation of the class settlement. We have no doubt that the firm's motives were pure: its (individual) clients were stub-period purchasers, and Wolf Haldenstein zealously protected those clients' interests. Even so, for us to award the firm compensation out of the stub plaintiffs'

recovery would encourage future attorneys to attempt to win fees for themselves by claiming to represent putative but uncertified subclasses—thus undermining the basic purposes of the PSLRA. *See supra* Part V.B.3.

### 2. Was Wolf Haldenstein's Work Gratuitous?

Wolf Haldenstein also attempts to characterize its settlement monitoring as work performed on behalf of the entire class and at the request of Lead Counsel. It alleges that, after it learned of the proposed settlement in December 1999, it communicated with Lead Counsel—including via a January 18, 2000, letter proposing that the post-April 15 purchasers should receive more from the settlement than other purchasers—and was ultimately "invited to review and comment on the proposed plan of allocation and to analyze whether that plan was fair to post-April 15, 1998 purchasers of Cendant securities." Wolf Haldenstein argued that its independent review of the allocation would reduce the settlement's vulnerability to objection from dissatisfied class members. The firm alleges that Lead Counsel agreed with this assessment, and that Wolf Haldenstein therefore hired John Hammerslough, a forensic damages expert, to review the settlement.

Hammerslough produced a report, dated February 21, 2000, which argued that the stub plaintiffs should receive "full recognition" of their losses. Meanwhile, on February 29, 2000, Daniel Berger of Lead Counsel wrote to Wolf Haldenstein, attaching the draft Plan of Allocation of the settlement and asking it to contact him with any comments. Wolf Haldenstein responded to this letter with two objections. Both objections related to the fact that post-April 15 claimants were not given a share in any recovery against Ernst & Young, because post-April 15 claims against the auditors had been dismissed. Wolf Haldenstein discussed these objections with Berger on March 16, 2000, but ultimately acceded to Lead Counsel's allocation.

Lead Counsel strenuously dispute Wolf Haldenstein's assessment of its role. Daniel Berger, of Lead Counsel firm Bernstein Litowitz, submitted a declaration characterizing Wolf Haldenstein's involvement in the settlement as unhelpful meddling rather than requested assistance. Lead Counsel gave Wolf Haldenstein the opportunity to comment on the settlement, and discussed its concerns (in part because Wolf Haldenstein

threatened to make confirmation of the settlement difficult), but did not ask Wolf Haldenstein to take part in settlement decisions or retain a damages expert. Furthermore, Berger stated that the only two suggestions that Wolf Haldenstein made regarding the plan, to increase stub purchasers' recovery and to allow them to share in the Ernst & Young settlement, were "rejected out-of-hand as patently absurd."

The District Court specifically credited Berger's factual allegations rather than those of Wolf Haldenstein partner Daniel Krasner. Far from finding clear error in this factual determination, we think that it was compelled by the documentary record. The correspondence between Berger and Krasner paints a very clear picture: Krasner was interfering in Lead Counsel's efforts, not because anyone asked him to, but because he hoped to get a better deal for his clients. We cannot fault such zealous advocacy, but it can hardly be characterized as work on behalf of the *class*, and Lead Counsel's decision to reject Wolf Haldenstein's suggestions was surely not unfair to the class as a whole. We therefore conclude that Wolf Haldenstein's efforts to improve the position of the stub purchasers were gratuitous and so not compensable.[20]

---

[20]Wolf Haldenstein also makes much of the fact that Lead Counsel requested its time information when preparing the request for fees. We do not think that this request for time sheets has any bearing on Wolf Haldenstein's entitlement to counsel fees. Lead Counsel note that they requested time records from every firm that performed any work related to the action—including, presumably, attorneys for every individual client—to enable Lead Plaintiffs to evaluate whether that work benefited the class and therefore deserved compensation. Lead Counsel never submitted a fee request for Wolf Haldenstein, or included Wolf Haldenstein's time records in its own fee requests. We think that Lead Counsel were exactly right in following this procedure. Under *Cendant I*, the responsibility for approving fee requests in the first instance did belong to the CalPERS group, and so Lead Plaintiffs had the right and indeed the obligation to consider whether any individual class member's firm conferred a benefit on the class. That does not, however, mean that Lead Counsel's request for time and expenses should be read as an acknowledgment that Wolf Haldenstein's efforts were requested by Lead Counsel, that the firm had any reasonable expectations of compensation, or that its work benefited the class.

### 3. Did Wolf Haldenstein's Actions Increase the Recovery?

Furthermore, Wolf Haldenstein's efforts on behalf of the stub plaintiffs did not in fact lead to any benefit for the stub purchasers or the class as a whole. The firm concedes that it was unable to convince anyone to modify the settlement allocation. Wolf Haldenstein's allegation that it served as an independent monitor of the fairness of the settlement, thus smoothing its path to approval, is insupportable: the same could be said about any individual class member's lawyer who read the settlement and allocation and decided not to object because he or she concluded that it was fair. The fact that Wolf Haldenstein, on its own initiative, paid thousands of dollars to have a damages expert review the settlement does not transform the firm into an impartial advocate for the fairness of the settlement. Wolf Haldenstein has not demonstrated that it did anything for the class beyond consume the time of the class's Lead Counsel.

The efficacy of Wolf Haldenstein's efforts might be relevant to our evaluation of Lead Plaintiffs' good faith. If Wolf Haldenstein's letters to Lead Counsel had in fact led to a significant change in the allocation of the settlement, then we might draw some parallels between its situation and that of an objector, *see supra* note 17. If Wolf Haldenstein's efforts had increased the stub plaintiffs' recovery at the expense of Lead Plaintiffs, then we might have reason to doubt both the initial fairness of Lead Counsel's allocation and Lead Plaintiffs' good faith in denying compensation to Wolf Haldenstein.

On the facts presented here, however, Lead Counsel dismissed Wolf Haldenstein's suggestions as meritless special pleading on behalf of its clients. Wolf Haldenstein was persuaded by Lead Counsel's explanations, and did not press any objections to the settlement before the District Court. Having reviewed the correspondence, we find Lead Counsel's rejection of Krasner's complaints perfectly reasonable, and are therefore satisfied that Lead Plaintiffs acted in good faith in denying compensation to Wolf Haldenstein.

### VIII. Conclusion

For the reasons set forth above, the judgment of the District Court will be affirmed in all respects.